IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

VICKI UTLEY, as Representative Heir at Law )
of BRIAN UTLEY, Deceased, )
)
        Plaintiff, )
)
vs. ) Case No. 05-1356-MLB
)
ROBERT E. WRAY, D.O., et al, )
)
        Defendants. )

**DEFENDANT ROBERT E. WRAY, D.O.'S MOTION TO STRIKE
PLAINTIFF'S EXPERTS MICHAEL J. FINE, M.D. AND JOHN LUCE, M.D.**

COMES NOW, Defendant Robert E. Wray, D.O., (hereinafter referred to as "Defendant"), by and through his undersigned counsel, and moves to strike two of Plaintiff's experts, Michael J. Fine, M.D. and John Luce, M.D. for failure to comply with the requirements of K.S.A. 60-3412.

### A. INTRODUCTION

Plaintiff filed this medical malpractice action on November 30, 2005 alleging Dr. Wray and others were negligent in their treatment of the decedent, Brian Utley. Plaintiff disclosed five experts on November 28, 2006, including Michael J. Fine, M.D. and John Luce, M.D. Drs. Fine and Luce are board certified in internal medicine, as is Defendant Dr. Wray. Dr. Fine and Dr. Luce provided their deposition testimony on January 4, 2007 and January 8, 2007 respectively, and offered criticisms of the care provided by Dr. Wray. During their testimony it became apparent that neither expert complies with the requirements of K.S.A. 60-3412, which provides as follows:

> "In any medical malpractice liability action, as defined in K.S.A. 60-3401 and amendments thereto, in which the standard of care given by a practitioner of the healing arts is at issue, no person shall qualify as an

expert witness on such issue unless at least 50 percent of such person's professional time within the two-year period preceding the incident giving rise to the action is devoted to actual clinical practice in the same profession in which the defendant is licensed."

Defendant will address the testimony of each expert individually and show how neither expert devoted at least 50 percent of their professional time to actual clinical practice as required by statute, and is therefore not qualified to testify as an expert on the standard of care in this case.

### 1. MICHAEL FINE, M.D.

Dr. Fine's testified in his deposition that his professional time is devoted to 20 percent patient care, 10-15 percent administrative functions, and 70-75 percent research. Thus his professional time devoted to "actual clinical practice" falls *far short* of the 50 percent "actual clinical practice" required by §60-3412. On January 4, 2007, Dr. Fine testified in the following manner regarding his professional practice:

> Q: Okay. Your activities, if we took 100 percent of your professional time, is this still the breakdown of how you spend your time, 20 percent doing patient care, 10 to 15 percent doing administration and 70 to 75 percent doing research?
>
> A: That's correct. But I would add that all of the research that I do is clinically relevant, deals with patients and can be considered clinical.
>
> Q: When you are doing research and it's clinical research, are you providing primary care to patients?
>
> A: No.

(See Exhibit A, Deposition testimony of Michael Fine, M.D., p. 30, line 3-25). Dr. Fine agreed that when he was conducting research, he was not providing any medical treatment to the patients who were part of his research:

>    Q:    When you are doing research, the clinical research that you have described, you as the researcher are not actually providing treatment to that particular patient who you come into contact with; true?
>
>    A:    Correct.
>
>    Q:    What you are doing is collecting information, and then a patient down the road possibly may benefit from this research that you're are doing?
>
>    A:    Correct.
>
>    Q:    So when we look at the percentage of your professional time where you are actually providing diagnostic services and treatment intervention and medical advice to a patient who is in need, that's about 20 percent of your professional time; true?
>
>    A:    Yes.

(See Exhibit A, p. 31, line 16 – p. 32, line 13). Dr. Fine (possibly seeing that his clinical experience did not satisfy Kansas law), attempted to qualify his testimony by stating that his research is "clinically relevant." (See Exhibit A, p. 30, line 12-21). However "clinically relevant" is not equivalent to "actual clinical practice," and certainly not what the legislature intended when it established the requirement in §60-3412.

In *Endorf v. Bohlender*, 995 P.2d 896 (Kan.App. 2000), the court was faced with interpreting the legislature's intent when it approved the phrase "actual clinical practice." The court found that "legislative intent may best be determined from the plain meaning of the words used in the statute in light of all experience available to the law-making body." *Id.* at 901. The court concluded that "actual clinical practice" means patient care, but bedside care or physical presence was not necessary to qualify as patient care. *Id.* at 903. In making this qualification, however, the court was addressing physicians who may advise on, or address care for, a patient by way of teleconferencing or any other

distance mode (video teleconferencing, e-mail, fax, etc.). *Id.* at 903. However the court rejected plaintiff's theory that "actual clinical practice" includes any "medically-related activity a physician engages in, except expert review and testimony for civil litigation" or that "a full-time researcher who sees no patients at all could qualify as a standard of care expert witness in a Kansas medical malpractice case." *Id.* at 901. It is of interest to note that the *Endorf* case dealt with and unqualified expert being produced by attorney Anne Pankratz. Much as she did in *Endorf*, Ms. Pankratz is once again attempting to utilize and expert who is not qualified to testify in Kansas. Ms. Pankratz argued in *Endorf* that all activity by a physician (aside from expert testimony work) should be considered active clinical practice of medicine and the Court rejected this argument:

> "Plaintiff would have us define "actual clinical practice" here as any medically-related activity a physician engages in, except expert review and testimony for civil litigation. Under plaintiff's interpretation, the K.S.A. 60-3412 phrase "actual clinical practice" includes direct patient care, consultation, research, education, mentoring, and administrative activities within the medical profession. Under plaintiff's rationale, a full-time researcher who sees no patients at all could qualify as a standard of care expert witness in a Kansas medical malpractice case. Plaintiff contends that as long as a research does not spend more that 50 per cent of his or her time testifying in civil trials, the expert qualifies under K.S.A. 60-3412. We disagree."

*Id.* at 901.

Although the *Endorf* Court conceded that a physician who provides clinical care over the phone is still engaged in the active clinical practice of medicine, the court was careful to distinguish this kind of medical work from non-clinical work.

> "Actual clinical practice" means patient are. However, patient care should not be limited to a physical presence or bedside requirement. Fr example, here, Dr. Bohlender was criticized by Dr. Barish for failing to call Poison

> Control. Had such a call been placed, the physician in Poison Control advising the emergency room doctor on patient care would be engaged in patient care and thus in actual clinical practice. In this technological age of video teleconferencing, and the like, the practitioner of healing arts advising on, or addressing care for, a distant patient is engaged in actual clinical practice.

*Id.* at 903.

* * *

> "The Kansas Legislature has used "clinical" many times in health care legislation. A legislative distinction between "clinical", on one hand and "administrative," "educational," "research," and "theoretical" on the other is gleaned from a review of selected statutes.

*Id.* at 902.

Dr. Fine primarily performs research, testifying that *70-75 percent* of his time is devoted to research. While he is conducting research, he is not performing physical exams on the patients and he is not providing treatment for the patients in his research group. (See Exhibit A, p. 89, line 22 – p. 90, line 3; see also p. 31, line 16-23). He is not their attending physician, and may not personally ever see the patient. (See Exhibit A, p. 90, line 14-22; see also p. 90, line 10-13). As a clinical researcher Dr. Fine is simply compiling the patient's data to be used at sometime in the future, and possibly to benefit a future patient class. (See Exhibit A, p. 31, line 2 – p. 32, line 4). Dr. Fine attempts to bring his clinical research into the "actual clinical practice" classification by contending that his research is clinically relevant. (See Exhibit A, p. 30, line 12-21). However one could argue that *all* medical research is clinically relevant – with intent to impact or improve patient care. This does not mean that all medical researchers, by definition, engage in actual clinical practice as intended by the Kansas legislature.

It was clear from Dr. Fine's testimony that the vast majority of his professional time is devoted to research. While Dr. Fine's research may be clinically interesting, it

falls short of meeting the definition of actual clinical practice as envisioned by the Kansas legislature. The professional time Dr. Fine devotes to actual clinical practice falls far short of the 50 percent required by §60-3412, thus Dr. Fine is not qualified to offer standard of care opinions as applied to Dr. Wray's care.

2. **JOHN LUCE, M.D.**

Dr. John Luce has also been identified as an expert by Plaintiff, and provided his deposition testimony on January 8, 2007. Dr. Luce is a professor of clinical medicine and anesthesia with the Department of Medicine and Anesthesia, at the University of California – San Francisco School of Medicine, and Chief Medical Officer of San Francisco General Hospital. (See Exhibit B, Deposition testimony of John Luce, M.D., Exhibit 1). Like Dr. Fine, Dr. Luce also fails to meet the requirements of §60-3412 in that less than 50 percent of his professional practice was devoted to the actual clinical practice of medicine. Dr. Luce testified that one-third of his professional practice is devoted to patient bedside practice, or in other words, serving as an attending physician. One-third of his professional practice is devoted to research and teaching, and the remaining one-third is devoted to administrative functions. (See Exhibit B, p. 19, line 10 – p. 20, line 7). An examination of his testimony regarding each of these categories shows clearly that he is unqualified to provide expert testimony in this lawsuit.

a. **Active clinical practice**

One-third of Dr. Luce's practice is devoted to actual clinical practice, in the traditional sense of the word. That is, one third of his professional time is devoted to bedside care of patients as an attending physician. (See Exhibit B, p. 19, line 10 – p. 20, line 7). Dr. Luce testified that he spent four months of the year in active clinical practice,

seeing patients and prescribing treatment, including a three-month rotation in intensive care, and a one-month rotation in the hospital ward. (See Exhibit B, p. 16, line 12-20; see also p. 16, line 21 – p. 17, line 1). However Dr. Luce also testified that the last time he saw scheduled patients in a clinic or outpatient setting was in 1981 or 1982, and the last time he saw a patient as an emergency room physician was in 1981. (See Exhibit B, p. 18, line 7-10; see also p. 18, line 17-21).

  b.  **Research and teaching**

Dr. Luce testified that he spent one-third of his professional time devoted to research and teaching. (See Exhibit B, p. 19, line 10 – p. 20, line 7). He delineated his research to include that devoted to Acute Respiratory Distress Syndrome (ARDS), and research regarding withholding life support for critically ill patients, devoting equal professional time to each research focus. (See Exhibit B, p. 20, line 8 – p. 21, line 2). Regarding his ARDS research, all that Dr. Luce does is confirm the patient's diagnosis and "randomizes" the patient, that is, assigns the patient to a therapeutic group. He advises the physicians of the results of his research. However, his actual patient contact is limited: he is not listed as the attending, a consultant or as an ordering physician, and is not prescribing treatment or writing prescriptions for the patients. (See Exhibit B, p. 20, line 8 – p. 21, line 18).

Dr. Luce's other research focus, the effects of withholding life support for critically ill patients, is conducted retrospectively and involves ***no contemporaneous patient contact.*** (See Exhibit B, p. 21, line 19 – p. 22, line 12). Therefore, considering Dr. Luce's two key areas of research, Dr. Luce testified in the following manner:

  Q:  Okay. So if we took 100 percent being the 100 percent of time that you spend in research, in medical research, do you have any

> estimate as to what percentage of time would be contemporaneous where you'd have some patient contact?
>
> A:      Probably 50 percent.

(See Exhibit B, p. 22, line 13 – 19). Although Dr. Luce may see patients in conjunction with his ARDS research, he is not seeing them as an attending or as a consultant, nor is he prescribing a course of treatment or prescribing medication. His sole purpose is to confirm the ARDS diagnosis, randomize the patients into therapeutic groups, see that the therapy is carried out, and analyze the data that is compiled. This type of "patient contact" falls short of "actual clinical practice" in that Dr. Luce's role is that of a *researcher*, not a physician providing treatment.

### c.   Administrative functions

Dr. Luce testified that one-third of his professional time is devoted to administrative functions, which include utilization management and risk management (See Exhibit B, p. 22, line 20 – p. 23, line 20). Utilization management involves determining whether treatment recommendations are cost effective and medically necessary, whereas risk management essentially looks at bad outcomes. *Id.*. As an administrator, Dr. Luce may see the patient and/or the patient's family regarding a bad result, but oftentimes the bad result may be the death of a patient, and then there is no patient contact. *Id.* Clearly these administrative duties do not involve the type of "active clinical practice" envisioned by the legislature when §60-3412 was instituted. The purpose of the statute is to require that experts, who are criticizing physicians who *have* an actual clinical practice, are engaged in clinical practice themselves at least 50 percent of their professional time. One-third of Dr. Luce's practice is administrative, and his attempt to take purely administrative functions, such as utilization management and risk

management, and fabricate an "active clinical practice" from those functions is a veiled attempt to comply with the statute. He is not diagnosing, providing treatment, or prescribing medication. He is essentially making sure the patient is at the right facility for his or her needs level, or he is dealing with complaints regarding care. The following testimony indicates the limited clinical role he plays as administrator:

> Q: Okay. In the one-third of the time that you spend with administrative duties, would you ever be ordering a certain type of medical test or a certain type of medical treatment for any of the patients you would see as an administrator?
>
> A: No.

(See Exhibit B, p. 24, line 9-14).

Kansas law does not support Dr. Luce's perception that "active clinical practice" includes the administrative functions he performs. In *Endorf, supra,* the court rejected the plaintiff's argument that "actual clinical practice includes direct patient care, consultation, research, education, mentoring, and administrative activities within the medical profession." *Endorf,* at 901. The court examined the plain meaning of the words used in the statute, and referred to Stedman's Medical Dictionary 353 (26th ed.1995) to define "clinical" and "practice": clinical means "1. Relating to the bedside of a patient or to the course of his disease. 2. Denoting the symptoms and course of a disease, as distinguished from the laboratory findings of anatomical changes. 3. Relating to a clinic." *Endorf,* at 901. The legislature intended "actual clinical practice" to signify seeing, diagnosing and treating patients – as like Dr. Wray does on a daily basis. (See Exhibit C, Deposition testimony of Robert Wray, M.D., p. 18, line 17 – p. 19, line 9).

By testifying that from December 2001 to December 2003 he devoted one-third of his time to bedside patient care as an attending, one-third of his time to research and

teaching, and one-third of his time to administrative duties, Dr. Luce has clearly indicated that less than 50 percent of his time is devoted to "actual clinical practice." His attempt to include his activities as researcher and administrator into the definition of "actual clinical practice" must fail, because while he is performing those functions, he is not participating in patient care as envisioned by the Kansas legislature. Thus, Dr. Luce is not qualified pursuant to §60-3412 to offer standard of care opinions as applied to Dr. Wray's care.

## CONCLUSION

Dr. Fine and Dr. Luce are not qualified to provide standard of care opinions against Dr. Wray, as neither physician devotes 50 percent or more of their professional practice to actual clinical practice as required by K.S.A. 60-3412. Therefore, Defendant moves that they be stricken as experts for Plaintiff.

Respectfully Submitted,

SHAFFER LOMBARDO SHURIN

_____/s/_____
Jayson A. Ford, Esq. #21444
Craig A. Grimes, Esq.  SC #77893
911 Main Street, Suite 2000
Kansas City, MO 64105
Phone: (816) 931-0500
Fax: (816) 931-5775
ATTORNEYS FOR DEFENDANT
ROBERT WRAY, D.O.

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing was mailed, postage prepaid, this 27th day of March, 2008, to:

Anne H. Pankratz
Warner Law Offices
310 W. Central, Ste 110
Wichita, KS 67202
ATTORNEYS FOR PLAINTIFF

Mark R. Maloney
Gilliland & Hayes, PA
301 N. Main, Suite 1300
Wichita, KS 67202
ATTORNEYS FOR JEANENE KENNETT, ARNP

/s/ Jayson A. Ford
ATTORNEY FOR DEFENDANT
ROBERT E. WRAY, D.O.