IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

---oOo---

VICKI UTLEY, as Representative )
Heir at Law of BRIAN UTLEY, )
Deceased, )
            Plaintiff, )
                                ) Case No.
    vs. ) 05-1356-MLB
                                )
ROBERT E. WRAY, D.O.; JEANENE K. )
KENNETT, A.R.N.P.; PRATT )
REGIONAL MEDICAL CENTER, d/b/a )
KINSLEY RURAL HEALTH CLINIC, )
                                )
           Defendants. )
                                )
                                )

---oOo---

MONDAY, JANUARY 8, 2007

DEPOSITION OF JOHN LUCE, M.D.

---oOo---

REPORTED BY: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR


PLAINTIFF'S EXHIBIT 5

BARKLEY COURT REPORTERS (415) 433-5777

**Page 22**

1   THE WITNESS: Well, the research that is withholding
2   the draw of life sustaining therapy is research done
3   retrospectively through interviewing physicians or reviewing
4   patient records, and there would be no contemporaneous
5   patient contact with that research.
6       The research involving the Acute Respiratory Distress
7   Syndrome would be entirely contemporaneous. Because that's,
8   again, randomizing patients to one or two therapeutic
9   approaches. And the patients are there, and I would go with
10  the research coordinator and examine the patient and confirm
11  the diagnosis and randomize the patient and so forth and so
12  on.
13  Q.   BY MR. FORD: Okay. So if we took 100 percent being
14  the 100 percent of time that you spend in research, in
15  medical research, do you have any estimate as to what
16  percentage of that time would be contemporaneous where you'd
17  have some patient contact with?
18      MS. PANKRATZ: Object to the form of the question.
19      THE WITNESS: Probably 50 percent.
20  Q.   BY MR. FORD: Okay. Then you also have approximately
21  one-third of your professional time with administrative
22  duties; is that correct?
23  A.   Yes.
24  Q.   I'm assuming that would not involve actual patient
25  contact --

**Page 23**

1       MS. PANKRATZ: Object to the --
2   Q.   BY MR. FORD: -- is that fair?
3       MS. PANKRATZ: Object to the form of the question.
4       THE WITNESS: No. The responsibilities that I have
5   had for about the last 15 years, which are now part of my job
6   as chief medical officer, but there have been other
7   responsibilities added, have included things like utilization
8   management.
9       Where if there's a patient who our utilization review
10  nurses thinks should be at a different level of care, I'll be
11  asked, as I was yesterday, to go see the patient, determine
12  whether the patient needs to be in the hospital or not, talk
13  to the physicians about if this patient should be in a
14  different kind of facility, that sort of thing.
15      That involves risk management. In many cases is a
16  matter of looking at bad outcomes. In some cases the
17  patients are still alive, and I will go examine the patient
18  or talk to the patient's family.
19      In some cases the patients are dead, so there would
20  not be a patient -- an interaction with a patient.
21  Q.   BY MR. FORD: Okay. Let me restate it, then. Is it
22  fair to state that the one-third of your time that's spent in
23  administrative duties, you would not be having contact with
24  patients wherein you're making a diagnosis or suggesting
25  treatment modality for those patients?

**Page 24**

1       MS. PANKRATZ: Object to the form of the question.
2       THE WITNESS: Well, the treatment modality would be
3   true as far as the diagnosis is concerned. If treatment
4   modality is -- includes where the patient should be seen or
5   whether or not the patient should be worked up in this clinic
6   versus that clinic, then I would consider that part of the
7   treatment. But it would really depend on what your
8   definition of "treatment" is.
9   Q.   BY MR. FORD: Okay. In the one-third of the time
10  that you spend with administrative duties, would you ever be
11  ordering a certain type of medical test or a certain type of
12  medical treatment for any of the patients you would see as
13  administrator?
14  A.   No.
15  Q.   Okay. So if we add this -- if we add this all up --
16  and, again, we are talking about prior to autumn of 2006. If
17  we add up the totality of the time that you spend
18  professionally in all of these different areas, is it fair to
19  state that when you add it all up, less than 50 percent of
20  your professional time is spent making diagnoses and
21  prescribing treatment for your patients?
22      MS. PANKRATZ: Object to the form of the question.
23      THE WITNESS: Beyond the situations that I mentioned
24  in terms of where patients are randomized into studies in
25  which the therapy they are getting is dictated by whichever

**Page 25**

1   arm of the study they are in and recognizing that diagnosing
2   them is part of that study, with the exception of that, I
3   think what you said is correct.
4   Q.   BY MR. FORD: Okay. Now, if we look at 2007 -- let
5   me take a step back. Strike that.
6       If we take it from the time of fall of 2006 to the
7   present, tell us how you would divide out your time as of the
8   autumn of 2006.
9   A.   So as we have discussed, I have gone as a third of my
10  time as an attending physician to a quarter of my time as an
11  attending physician.
12      The teaching and clinical research, the teaching has
13  remained the same load that I had previously, and we haven't
14  talked much about that. I am talking here not about bedside
15  teaching on rounds, but I am talking about didactic seminars
16  and that type of thing. That has remained the same.
17      The research, as I said to you earlier, I am no
18  longer a member -- no longer supported by two research
19  grants. One is the Acute Respiratory Distress Syndrome
20  Network, and the other one is a related activity but involves
21  the same kind of patients but a separate grant. That's
22  fallen away.
23      And my administrative or executive functions have
24  increased proportionally. So today I would say that I
25  probably -- I have always thought prior to this last year

1  that I did over 50 percent of my activity directly involved
2  with patients.
3      I would say now given that I'm not doing that
4  research that I described to you anymore, it is probably
5  below 50 percent.
6  Q.  Okay. And I don't care if you use fractions or
7  percentages, but I have started writing down this list.
8  There's being an attending physician, and I think you told us
9  that's 25 percent now of your professional time?
10 A.  Right.
11 Q.  Then I have got three more, teaching, research and
12 administration. Are there numbers or fractions that you'd
13 put with each one of those?
14 A.  Yeah, I think it is probably fair to say that I am
15 spending, if we do it by months -- well, I would say three
16 months a year of attending that I have already discussed.
17 Probably one month a year of research and teaching, which
18 would get us -- I don't know. That's one-twelfth in terms of
19 fractions. Three-twelfths and one-twelfth is four-twelfths.
20 And that leaves eight-twelfths, I think, for administration.
21     So three months for attending, one month for research
22 and lecturing is four months, leaving us eight months, and
23 that's what I spend administratively.
24     As I mentioned to you earlier, this administrative
25 stuff has a lot of overlap with clinical medicine that I

Page 26

1  consider a part of it. But your question was more about when
2  do I actually see a patient, and I think that's probably a
3  way of dividing it up.
4  Q.  Okay. Because to be fair to you, Doctor, if I
5  misstate this, correct me, even when you are acting as the
6  chief medical officer, you may come into contact with
7  patients on such things as risk management, and you may be
8  called upon as the administrator to come meet with a family
9  or meet with a patient, true?
10 A.  True.
11 Q.  So it is not a situation whereas the administrator
12 doing your eight months of administration, you are sitting in
13 your office and no one comes and bothers you, right?
14 A.  Correct.
15 Q.  But when we look at a delineation to those times
16 wherein you're actually seeing patients to order tests, make
17 diagnoses, direct treatment, order treatment for the patient,
18 in those situations currently, as of the autumn of 2006, that
19 makes up 25 percent of your total professional time; is that
20 fair?
21    MS. PANKRATZ: Object to the form of the question.
22    THE WITNESS: Well, yeah, I guess that's true.
23 Because that would be the three months, and the other month
24 is a combination of teaching and research, which does not
25 include direct patient contact. Yes, I think that's fair.

Page 27

1  Q.  BY MR. FORD: Okay. Is it still true that
2  approximately one-third of your income comes from doing legal
3  matters?
4  A.  I think I have mentioned in recent years -- I don't
5  know vis-a-vis the cases that you reviewed, but I think in
6  recent years I have said between a third and a half, and I
7  think that's a fair statement, yes.
8  Q.  All right. Now that you have become CMO and you have
9  had this change, at least in some degree, in your
10 professional duties, do you anticipate as you look ahead in
11 2007 and 2008 for those numbers, a third to a half, to
12 maintain those percentages?
13 A.  Yes.
14 Q.  Okay. Has it been true, at least up to January of
15 2007, that if you looked at the totality of the number of
16 cases that you have given a deposition, much like we're here
17 today, that the majority of those were for the plaintiff who
18 is suing the healthcare provider, wherein you were testifying
19 for the plaintiff?
20 A.  No. We can be exact, actually, which is one of the
21 reasons that I have kept this guide, because I am asked the
22 question so many times.
23 Q.  Would you tell us which number you are looking at?
24 A.  I am looking at Exhibit 5, the front page, which is a
25 summary. This is last updated on the 1st of November. So

Page 28

1  there's been some additions, but this would say as of
2  November 1st, 2006 of the total number of cases which look
3  like they are roughly -- more than roughly. They are 977
4  cases. 545 were defense cases, and 428 were plaintiffs.
5      When I figured this out before, it's been 55 percent
6  defense and 45 percent plaintiff. I haven't done the math,
7  nor could I without a calculator or a pencil and piece of
8  paper, but I think it is still pretty close. I have always
9  done more defense work than plaintiff.
10 Q.  Very good. Is it still true that you have not
11 published anything in the medical literature that
12 specifically deals with bacterial or viral pneumonia?
13 A.  Yes, to my knowledge. Again, as you know, because
14 you read my stuff and have my CV, I published about the Acute
15 Respiratory Distress Syndrome, and bacterial pneumonia is a
16 common cause of that.
17     So in the context of ARDS, I have discussed it, but
18 not a discrete article, to my knowledge, about bacterial
19 pneumonia.
20 Q.  Understood. Have you ever been called upon to look
21 at whether an emergency room doctor in an emergency room
22 setting has met the standard of care?
23 A.  Your question is complicated by the fact that in
24 California, non-emergency room doctors are not allowed to
25 talk about the standard of care issues regarding emergency

Page 29

**Page 74**

1    I will read through my notes.
2        MS. PANKRATZ: I have some questions first.
3        MR. FORD: Oh, goodie. That won't make things go
4    longer. Go ahead.
5            EXAMINATION BY MS. PANKRATZ
6    Q.  Doctor, I wanted to focus specifically on your time
7    between December 2001 and December 2003, okay. You have that
8    time frame in mind?
9    A.  I do.
10   Q.  Now, during this time frame, one-third of your time
11   was spent being an attending physician?
12   A.  Correct.
13   Q.  And 100 percent of your time was spent in the actual
14   clinical practice of medicine, meaning at the patient's
15   bedside?
16       MR. FORD: Objection to the form of the question.
17   That misstates his previous testimony. Also a misstatement
18   of facts.
19       MR. MALONEY: Join.
20   Q.  BY MS. PANKRATZ: Go ahead.
21   A.  That would be the time that I was an attending
22   physician, when I was at the bedside.
23   Q.  Right. But you were an attending physician?
24   A.  Correct.
25   Q.  Taking care of patients?

**Page 75**

1    A.  Yes.
2    Q.  Okay. One-third of your time was in research and
3    teaching or just research?
4    A.  I usually divide it out as researching and teaching.
5    That's the way I have done it in the past.
6    Q.  Okay. In your research activities, sir, is it true
7    part of your time you would advise and direct others on
8    patient care matters?
9    A.  Yes.
10   Q.  I would provide patient supervision?
11   A.  In the sense that the patients were in a clinical
12   trial and I was supervising the clinical trial and making
13   sure that they were getting the therapies that were dictated
14   by the protocols and make sure that they weren't suffering
15   adversely from those things.
16   Q.  You would provide consultation to others regarding
17   patient care?
18   A.  Yes.
19       MR. FORD: I am going to object to the form of the
20   question. Again, that misstates his previous testimony. It
21   is vague and ambiguous as set forth by counsel.
22       MR. MALONEY: Join.
23   Q.  BY MS. PANKRATZ: You would provide peripheral duties
24   related to the actual -- related to actual patient care;
25   would that be a true statement?

**Page 76**

1        MR. FORD: I will object to the form of that question
2    as being vague and ambiguous, but you may answer, Doctor.
3        MR. MALONEY: Join.
4        THE WITNESS: Yes.
5    Q.  BY MS. PANKRATZ: And you would provide other
6    indirect patient care activities; would that be true?
7        MR. FORD: Same objections.
8        MR. MALONEY: Join.
9        THE WITNESS: Yes, in the context of what I said
10   earlier.
11   Q.  BY MS. PANKRATZ: And of the one-third of your time
12   that was spent in research, was more than 50 percent of that
13   time spent in clinical matters that we just discussed, this
14   advice and address on patient care, patient supervision,
15   consulting others on patient care, peripheral duties related
16   to actual patient care and indirect patient care activities?
17       MR. FORD: Objection to the form of the question.
18   Been asked and answered. It is vague and ambiguous as stated
19   by counsel for the same reasons stated previously.
20   Q.  BY MS. PANKRATZ: Go ahead, Doctor.
21       MR. MALONEY: Join.
22       THE WITNESS: Yes. I tried to make an earlier
23   distinction between research involving contemporaneous
24   patients and then research involving chart review and
25   patients who had died in the intensive care unit. The bulk

**Page 77**

1    of the research, granted, was with the contemporaneous
2    patients, those who had the Acute Respiratory Distress
3    Syndrome.
4    Q.  BY MS. PANKRATZ: Okay. And certainly when you're
5    teaching and supervising residents, there's elements of
6    clinical medicine in that, true?
7    A.  Yeah, I try to draw a distinction between the third
8    of the time that I'm the attending physician doing bedside
9    teaching with the house staff and the kinds of people that we
10   discussed earlier on the various rotations, and then teaching
11   of a didactic nature which I included in that one-third,
12   which would be largely lectures, seminars, things of that
13   nature. That was a small part compared to what the research
14   but part was of that whole one-third, if you will.
15   Q.  Okay. But more than 50 percent of the one-third of
16   research is involved in actual clinical medicine; would that
17   be true?
18       MR. MALONEY: Object to the form.
19       MR. FORD: Same objections as stated previously.
20       MR. MALONEY: Join.
21       THE WITNESS: Yes.
22   Q.  BY MS. PANKRATZ: Okay. Then we have one-third
23   administrative?
24   A.  Right.
25   Q.  And part of the administrative involves the actual

**Page 78**

1  clinical practice of medicine, true?
2      MR. FORD: Objection to the form of the question.
3  That misstates his previous testimony. It is argumentative.
4  Vague and ambiguous.
5      MR. MALONEY: Join.
6      THE WITNESS: Wow, all those things.
7      MR. MALONEY: And more.
8      THE WITNESS: Yeah, I have given specific examples of
9  when I actively involve myself in the care of patients in a
10 non-attending, non-research fashion.
11 Q.  BY MS. PANKRATZ: Under the administrative --
12 A.  Under administrative.
13 Q.  -- category, and that, again, included utilization
14 review when you would go to the patient's bedside from time
15 to time, risk management when you would go to the patient's
16 bedside from time to time.
17     Of the one-third of administrative that involves
18 clinical components, how much of the one-third of
19 administrative involves the clinical practice of medicine?
20     MR. FORD: Same objections. It is vague and
21 ambiguous. You are using two terms that don't make any
22 sense. It is not clinical practice. That's been asked and
23 answered.
24     You can answer, Doctor.
25     MR. MALONEY: Join.

**Page 79**

1  Q.  BY MS. PANKRATZ: Go ahead, Doctor.
2  A.  I think probably a third of it.
3  Q.  A third of the third?
4  A.  A third of the third.
5  Q.  Okay. So, Doctor, between December 2001 and December
6  2003, based on the totality of your professional time, did
7  you spend more than 50 percent of your time in the actual
8  clinical practice of medicine?
9      MR. FORD: Objection to the form of the question. I
10 already asked that exact question. It's already been
11 answered.
12     THE WITNESS: As I define the clinical practice of
13 medicine, yes.
14 Q.  BY MR. MALONEY: Okay. Sir, would it be a true
15 statement that all of your professional time is spent in
16 either direct or indirect patient care?
17     MR. FORD: Same objections.
18     MR. MALONEY: Join.
19     THE WITNESS: That's the way I see it, yes.
20 Q.  BY MS. PANKRATZ: Okay. Sir, do you know Dr. Michael
21 Fine from Pittsburgh?
22 A.  Only by reputation.
23 Q.  And what is Dr. Fine's reputation?
24 A.  Outstanding.
25 Q.  And "outstanding," can you define that for us? How

**Page 80**

1  do you know him by reputation?
2  A.  I think I have actually met Dr. Fine at a convention,
3  medical meeting. But Dr. Fine is known for his work in
4  Community-Acquired Pneumonia. He is, by my understanding, an
5  internist, not a pulmonologist like myself.
6      But he's done pioneer work in the diagnosis and
7  management and the outcome of Community-Acquired Pneumonia.
8  Q.  Now --
9  A.  And I think he was actually a member of the group
10 that wrote these American Thoracic Guidelines, and I have not
11 checked on that. Let me just see here. Yes, he was also a
12 member of this ad hoc -- I assume an ad hoc group of the
13 American Thoracic Society.
14     See if they describe how it was created. They don't
15 say how the group was constituted. I was the chairman of a
16 comparable group that wrote a physician paper for the ATS on
17 research ethics, so I know the process.
18     Generally speaking, these are ad hoc groups, so I
19 assume that's what it was.
20 Q.  Doctor, on December 7th, 2003 when Brian Utley was in
21 the emergency room at the Edwards County Hospital, what's
22 your understanding of how Dr. Wray assessed his lung sounds?
23 A.  I think Mrs. Utley said he listened to his lungs
24 through a sweatshirt and confined himself to the anterior
25 chest.

**Page 81**

1  Q.  And would that comply with the applicable standard of
2  care how lung sounds should be assessed on an emergency room
3  patient that presented with Brian Utley's symptoms?
4      MR. FORD: Going to object to the form of the
5  question. He's already been asked the totality of his
6  opinions, and he's already given those.
7      Go ahead, Doctor.
8      THE WITNESS: No, it would not.
9  Q.  BY MS. PANKRATZ: Why not?
10 A.  Because if one were relying upon a chest examination
11 to decide whether a patient had a respiratory infection,
12 you'd have to listen to the back of the lungs, and you'd have
13 to listen through directly to the chest wall or through a
14 very light material, not a sweatshirt.
15 Q.  Do you have an opinion based on a reasonable degree
16 of medical certainty that had Dr. Wray assessed Brian Utley's
17 lung sounds in accordance with the standard of care, whether
18 the lung sounds would have been normal or abnormal based upon
19 his other symptoms he presented with and everything?
20     MR. FORD: Objection to the form of the question. It
21 assumes facts not in evidence. Misstates the medical record.
22     Go ahead and answer, Doctor.
23     THE WITNESS: I can't say. I don't put much credence
24 in the physical examination to diagnose pneumonia. Dr. Wray
25 does from his deposition. I don't know what his physical