**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

VICKI UTLEY, as Representative Heir at Law of BRIAN UTLEY, Deceased,

Plaintiff,

v.

ROBERT E. WRAY, D.O., and JEANENE K. KENNETT, A.R.N.P.,

Defendants.

**CIVIL ACTION**

No. 05-1356-MLB

**MEMORANDUM AND ORDER**

This matter comes before the court on defendant Robert Wray, D.O.'s ("Dr. Wray's") motion to strike two of plaintiff's witnesses, Michael J. Fine, M.D. ("Dr. Fine") and John Luce, M.D. ("Dr. Luce"). (Doc. 131.) The motion has been fully briefed and is ripe for decision. (Docs. 132, 153.)

Dr. Wray contends that neither Drs. Fine nor Luce are "qualified to provide standard of care opinions against Dr. Wray, as neither physician devotes 50 percent or more of their professional practice to actual clinical practice as required by K.S.A. 60-3412." (Doc. 131 at 10.) Dr. Wray then moves that both doctors "be stricken as experts for Plaintiff." (Doc. 131 at 10.) Plaintiff responds that section 60-3412 "only applies to the standard of care testimony of health care providers. The statute does not apply to causation testimony or to the standard of care testimony of non-health care providers." (Doc. 132 at 2.) Plaintiff also argues that Drs. Fine and Luce do, in fact, meet Kansas' fifty percent rule. (Doc. 132 at 2.)

The court held a status conference on April 23, 2008, at which it discussed both plaintiff and defendants' use of experts in the trial of this matter. Dr. Wray's motion is GRANTED in part and DENIED in part for the reasons stated more fully herein.

## I. FACTS AND PROCEDURAL HISTORY[1]

This is a medical malpractice case, filed on November 30, 2005. Plaintiff Vicki Utley, as representative of Brian Utley, brought a wrongful death claim against Dr. Wray, Jeanene Kennett, A.R.N.P. ("Nurse Kennett"), and Pratt Regional Medical Center d/b/a Kinsley Rural Health Clinic (the "Health Clinic").[2] Plaintiff alleges that defendants were negligent in the medical treatment of Brian Utley in December 2003.

Nurse Kennett was an Advanced Registered Nurse Practitioner, employed by the Health Clinic. (Doc. 123 at 2, ¶ 4.A.3.) Nurse Kennett is licensed by the Kansas Nursing Board. (Doc. 132 Exh. 2.) As a certified nurse practitioner, Nurse Kennett's supervising physician at the Health Clinic from June of 1999 to June of 2005 was Dr. Wray. (Doc. 123 at 3, ¶ 4.A.7.) In December, 2003, part of Dr. Wray's job with the Health Clinic was to review and supervise Nurse Kennett's job performance. (Doc. 123 at 3, ¶ 4.A.8.) At all relevant times, defendant Wray was a physician licensed by the Kansas State

---

[1] The facts do not appear to be in dispute. The conclusions to be drawn from them, and the applicability of certain Kansas statutes to them, however, is in dispute.

[2] The court previously ruled on the Health Clinic's partial motion for summary judgment (Doc. 121), and determined that no fault may be apportioned to the Health Clinic in the event of a jury verdict for plaintiff (Doc. 126). In that order, the court did not address the factual issue of negligence, but limited its discussion to the proper apportionment of a damages award.

Board of Healing Arts to practice medicine. (Doc. 123 at 3, ¶ 4.A.10.) Dr. Wray is a healthcare provider under Kansas law. (Doc. 123 at 3, ¶ 4.A.11.)

Plaintiff disclosed five experts to defendants, including Drs. Fine and Luce. Both Drs. Fine and Luce are certified in internal medicine, as is Dr. Wray. During their deposition testimony, Drs. Fine and Luce presumably criticized the care provided by Dr. Wray, but their opinions, whatever they may be, are admissible only if the witnesses meet the requirements of K.S.A. § 60-3412.[3]

Dr. Fine was questioned regarding the nature of his practice:

> Q. Okay. Your activities, if we took 100 percent of your professional time, is this still the basic break-down of how you spend your time, 20 percent doing patient care, 10 to 15 percent doing administration and 70 to 75 percent doing research?
>
> A. That's correct. But I would add that all of the research I do is clinically relevant, deals with patients and can be considered clinical.
>
> Q. When you are doing research and it's clinical research, are you providing primary care to the patients?
>
> A. No.
>
> Q. When you are talking about doing clinical research, what you are referring to is that as opposed to research where you go to the library, you crunch numbers or you collect data and you never see a live person, the type of research you do is you very well come into contact with patients; is that fair?
>
> A. Well, you come in contact with patients. You

[3] The extent of the expert opinion of each doctor is not known. For example, the court is unaware whether Drs. Fine and Luce opined on both Dr. Wray and Nurse Kennett's standard of care, whether they also opined on causation issues, or whether their opinions encompassed some combination of all these issues.

> collect data directly from patients such as labs and history and physical examination the same as you would do in a physician's office, and then the knowledge that you generate, in turn, can be used to improve the quality of care for future patients.
>
> Q. When you are doing research, the clinical research that you have described, you as the researcher are not actually providing treatment to that particular patient who you come into contact with; true?
>
> . . .
>
> A. Correct.
>
> Q. What you are doing is collecting information, and then a patient down the road possibly may benefit from this research that you are doing?
>
> A. Correct.
>
> . . .
>
> Q. So when we look at the percentage of your professional time where you are actually providing diagnostic services and treatment intervention and medical advice to a patient who is in need, that's about 20 percent of your professional time; true?
>
> A. Yes.

(Docs. 131 Exh. A at 2; 132 Exh. 1 at 3.) Dr. Fine also testified that, regarding the patients involved in his clinical research, he or a member of his research staff perform histories and physicals, collect labs, and perform physical exams. (Docs. 131 Exh. A at 3; 132 Exh. 1 at 4-5.)

Dr. Fine produced a post-deposition affidavit, in response to Dr. Wray's motion to strike, that states that during his deposition, he was not asked to specify his professional time within the two-year period preceding December 2003, but that the breakdown of his professional time was consistent with what he testified to at his

deposition. Dr. Fine's affidavit also states that the research which he testified about was patient-oriented clinical research. (Doc. 132 Exh. 3.)  Dr. Fine defined that research as:

> Research conducted with human subjects (or on material of human origin such as tissues, specimens and cognitive phenomena) for which an investigator (or colleague) directly interacts with human subjects. This area of research includes: (a) mechanisms of human disease, (b) therapeutic interventions, (c) clinical trials, or (d) development of new technologies.

(Doc. 132 Exh. 4.)

Dr. Luce testified at his deposition regarding the makeup of his professional activities:

> Q.  . . .  Have your professional duties changed significantly since October of 2002?
>
> . . .
>
> A.  I am now the chief medical officer of the hospital. . . . So I was named chief medical officer in 2005, and I think although my titles changed somewhat before that time, the only real changes in my responsibilities have come since my appointment as chief medical officer . . . . So, therefore, my total attending time . . . has been reduced from a total of four months, which it was prior to the fall of 2006, to now three months. . . .
>
> Q.  . . .  So if we look at what is on board for 2007 for Dr. Luce, we expect that you'll be doing that clinic work three months in the year 2007?
>
> . . .
>
> A.  Correct.

(Doc. 131 Exh. B at 2-3.)  Dr. Luce then described his research as follows:

> Q.  . . .  But my understanding is . . . if you looked at your professional time prior to the autumn of 2006, that one-third of your professional time was spent in the active

clinical practice of medicine, seeing patients, treating patients, one-third of your time was with administrative duties, and one-third of your time was doing research and teaching. Would you agree with that?

. . .

A.   That's the way that I have broken it out in many depositions before. I think you used the term active clinical medical practice to describe one-third of the time. I would differ with the description of that time. I would look at it as the bedside practice or serving as an attending physician. But a lot of the research I have done has been clinical research. In fact, all of it has been. And a lot of the administrative or executive functions that I have served, I see as being clinical, also.

. . .

A.   [Regarding the research,] I am there to make a diagnosis, because the patient couldn't be in the study if the patient didn't meet the definitions of those conditions.
     I am not prescribing treatment for the patient . . . but I am usually working with the physicians who are caring for the patient and, if you will, providing them with the results of research that our group is doing . . . .

. . .

A.   But I am not writing prescriptions for the patient . . . .

Q.   So with regards to patients who you may come into contact with during the course of your recent research activities, you would not be in a position where you're listed as an attending or a consulting or an ordering physician in any of those patients; is that fair?

A.   That is fair.

Q.   . . . And if we looked at your research time . . ., how much of your 100 percent research time would you say you have any type of contact with patients versus those in your research where you have no contact with patients?

. . .

> A. Probably 50 percent.

(Doc. 131 Exh. B at 3-4.) And finally, regarding his administrative duties, Dr. Luce stated:

> Q. . . . Is it fair to state that the one-third of your time that's spent in administrative duties, you would not be having contact with patients wherein you're making a diagnosis or suggesting treatment modality for those patients?
>
> . . .
>
> A. . . . But it would really depend on what you definition of "treatment" is.
>
> Q. Okay. In the one-third of the time that you spend with administrative duties, would you ever be ordering a certain type of medical test or a certain type of medical treatment for any of the patients you would see as administrator?
>
> A. No.

(Docs. 131 Exh. B at 4; 132 Exh. 5 at 2.) Dr. Luce added, however, that "prior to this last year," he "did over 50 percent of [his] activity directly involved with patients." (Doc. 132 Exh. 5 at 2-3.) And, when asked by plaintiff's counsel, Dr. Luce testified:

> Q. Doctor, I wanted to focus specifically on your time between December 2001 and December 2003, okay. . . .
>
> . . .
>
> Q. Now, during this time frame, one-third of your time was spent being an attending physician?
>
> A. Correct.
>
> . . .
>
> Q. Okay. One-third of your time was in research and teaching or just research?
>
> A. I usually just divide it out as research and teaching. . . .

> Q. Okay. In your research activities, sir, is it true part of your time you would advise and direct others in patient care matters?
>
> A. Yes.
>
> Q. I would provide patient supervision?
>
> A. In the sense that the patients were in a clinical trial and I was supervising the clinical trial and making sure that they were getting the therapies that were dictated by the protocols and make sure that they weren't suffering adversely from those things.
>
> Q. You would provide consultation to others regarding patient care?
>
> A. Yes.
>
> . . .
>
> Q. You would provide peripheral duties related to the actual-related to actual patient care; would that be a true statement?
>
> . . .
>
> A. Yes.
>
> Q. And you would provide other indirect patient care activities; would that be true?
>
> . . .
>
> A. Yes, in the context of what I said earlier.
>
> Q. And of the one-third of your time that was spent in research, was more than 50 percent of that time spent in clinical matters that we just discussed . . . .?
>
> . . .
>
> A. Yes. I tried to make an earlier distinction between research involving contemporaneous patients and then research involving chart review and patients who had dies in the intensive care unit. The bulk of the research, granted, was with the contemporaneous patients . . . .

(Doc. 132 Exh. 5 at 4-5.)

## II. ANALYSIS

The parties agree that Kansas law applies to this case. Section 60-3412 of the Kansas statutes provides:

> In any medical malpractice liability action, as defined in K.S.A. 60-3401 and amendments thereto, in which the standard of care given by a practitioner of the healing arts is at issue, no person shall qualify as an expert witness on such issue unless at least 50% of such person's professional time within the two-year period preceding the incident giving rise to the action is devoted to actual clinical practice in the same profession in which the defendant is licensed.

K.S.A. § 60-3412. Section 60-3401, the statutory section referred to within section 60-3412 for the definition of "medical malpractice liability action," has been repealed, leaving "medical malpractice liability action" undefined by the Kansas statutes. The parties agree, however, that this case is a medical malpractice action. See Docs. 131 at 1 ("Plaintiff filed this medical malpractice action. . . ."); 132 at 2 ("First, there is no question this is a medical malpractice action. . . .").

The Kansas Supreme Court stated that section 60-3412 "is intended to prevent the use of 'professional witnesses.' That is, practitioners of healing arts who spend less than 50 percent of their professional time in actual clinical practice in their profession are considered to be 'professional witnesses' rather than practitioners of their profession." Wisker v. Hart, 24 Kan. 36, 43-44, 766 P.2d 168, 174 (Kan. 1988). It is the burden of the party proposing a witness as an expert to show that the witness is qualified under section 60-3412. Endorf v. Bohlender, 26 Kan. App. 2d 855, 866, 995 P.2d 896, 904 (Kan. Ct. App. 2000).

**A. Drs. Fine and Luce as Experts Against Dr. Wray**

Plaintiff contends that Drs. Fine and Luce have met the requirements of section 60-3412 as expert witnesses against Dr. Wray, arguing that in the two years preceding the December 2003 incident, both doctors spent at least fifty percent of their professional time in actual clinical practice. In Endorf v. Bohlender, 26 Kan. App. 2d 855, 995 P.2d 896 (Kan. Ct. App. 2000), the Kansas Court of Appeals construed the phrase "actual clinical practice" located in section 60-3412. The court defined the phrase via its medical definition. The definition of "clinical" was stated as "relating to the bedside of a patient or to the course of his disease; denoting the symptoms and course of a disease, as distinguished from the laboratory findings of anatomical changes; or relating to a clinic." The definition on "practice" was stated as "The exercise of the profession of medicine or one of the allied health professions." Id. at 862, 955 P.2d at 901.

The Endorf court distinguished the word "clinical" from the words "administrative," "educational," "research," and "theoretical," and ultimately held that "'actual clinical practice' means patient care." Id. at 863, 865, 995 P.2d at 902-03. The court went on to state that "patient care should not be limited to a physical presence or a bedside requirement," but then seemingly limited this broad statement by giving the example of a physician attending a patient through video teleconferencing as performing actual clinical practice. Id. at 865, 995 P.2d at 903.

The Kansas Supreme Court sanctioned the court of appeals'

approach for defining "actual clinical practice" in Dawson v. Prager, 276 Kan. 373, 76 P.3d 1036 (Kan. 2003). In Dawson, the court stated that the Endorf court had "rejected the contention that administrative and academic pursuits and research would satisfy the statutory requirement of actual clinical practice." Id. at 376, 76 P.3d at 1039. The Dawson court then held that the proposed witness did not qualify as an expert under section 60-3412 because his direct patient care, in addition to patient consulting, supervising, admitting patients, and other various duties associated with patient care (all of which the Kansas Supreme Court termed "indirect patient care"), amounted to less than fifty percent of his professional time. Id. at 380-81, 76 P.2d at 1041-42.

The court concludes that plaintiff has not shown that Drs. Fine and Luce meet the standard required by section 60-3412.[4] The record shows that, during the two years proceeding December 2003, Dr. Fine spent twenty percent of his time on patient care, ten to fifteen percent of his time on administrative tasks, and seventy to seventy-five percent of his time conducting research. Dr. Fine testified at his deposition that his research was "clinically relevant" and

[4] In his reply brief, Dr. Wray argues that Dr. Fine's affidavit should be stricken, arguing that an affidavit cannot be used to circumvent section 60-3412. (Doc. 153 at 2.) Dr. Wray cites Dawson v. Prager, 276 Kan. 373, 76 P.3d 1036 (Kan. 2003), wherein the Kansas Supreme Court affirmed the lower court's decision to strike an affidavit that contradicted prior deposition testimony of a proposed witness in a dispute regarding that witness' eligibility to testify under section 60-3412.

It is not clear, however, that Dr. Fine's affidavit contradicts his prior deposition testimony or, rather, whether it merely supplements the prior testimony. Regardless, the court need not resolve this dispute. Even with consideration of Dr. Fine's affidavit, plaintiff fails to meet the standards required by section 60-3412.

expanded on this with his affidavit by stating that his clinical research was "patient oriented," i.e., based on direct interaction with a human subject.  This however, does not equate to "actual clinical practice," as defined by the Kansas courts.  See Dawson, 276 Kan. at 380-81, 76 P.3d at 1041-42 (rejecting an expert under section 60-3412 because the expert's "indirect patient care" amounted to less than fifty percent of his professional time); Endorf, 26 Kan. App. 2d at 863, 865, 995 P.2d at 902-03 (distinguishing the word "clinical" from the words "administrative," "educational," research," and theoretical," and ultimately holding that "'actual clinical practice' means patient care").  Dr. Fine testified that his clinically relevant research was not providing primary care to patients and did not involve actually providing treatment, but simply consisted of collecting information through labs and history and physicals.

Similarly, the record shows that Dr. Luce, during the relevant time period, spent one-third of his time as an attending physician, one-third of his time with administrative tasks, and one-third of his time on research and teaching.[5]  Dr. Luce testified that approximately fifty percent of his research was clinical research, but for the reasons stated above, this research would not be considered "actual clinical practice" of direct patient care by the Kansas courts.

As a result, neither Dr. Fine nor Dr. Luce qualifies as an expert as to standard of care under section 60-3412 against Dr. Wray.

---

[5] Neither Drs. Fine nor Luce apparently consider their services as an expert witness part of their "professional time," because neither doctor left room in the description of their time to include this activity.

**B.   Drs. Fine and Luce as Experts Against Nurse Kennett**

Plaintiff devotes a substantial portion of her response arguing that section 60-3412 is not applicable to Drs. Fine and Luce's testimony regarding Nurse Kennett's standard of care.  The Kansas courts have recognized that an expert witness is not required to comply with section 60-3412 when the expert is not testifying about the "standard of care given by a practitioner of the healing arts." Nold v. Binyon, 272 Kan. 87, 100-01, 31 P.3d 274, 283-84 (Kan. 2001).

In Nold, the Kansas Supreme Court stated:

> [Defendant] cites K.S.A. 60-3412, which addresses the standard of care for a practitioner of the healing arts.  K.S.A. 60-3412 is not applicable here.  "A nurse is commonly understood, as reflected in our statutory definition of nursing, to be a person who works in the same area as and under the supervision of a physician or other practitioner of the healing arts."  (Emphasis added.) State Bd. of Nursing v. Ruebke, 259 Kan. 599, 627, 913 P.2d 142 (1996).  A nurse is not a practitioner of the healing arts.  K.S.A. 65-2872(m).

Id.  The court then held that plaintiff's physician expert was "qualified to testify regarding nursing standards and their breach" and that the lower court had "erred in excluding his expert testimony regarding nursing standards."  Id. at 101, 31 P.3d at 284.

In an unpublished District of Kansas case, decided over ten years *before* Nold, the district court similarly discussed section 60-3412. See  Moss v. Feldmeyer, No. 89-1321-K, 1990 WL 146514, at *2-3 (D. Kan. Sept. 4, 1990).  The court defined "practitioner of the healing arts," using the Kansas Healing Arts Act, Kan. Stat. Ann. § 65-2801 et seq., as its guide, because the phrase was not defined within section 60-3412.  Id.  The procedure utilized in Moss is persuasive.

One of the statutes quoted in Moss, however, section 65-2868, has been repealed.  In its place is a statute, section 65-2872, specifically delineating persons not engaged in the practice of the healing arts.  It states that:

> (g) Persons whose professional services are performed under the supervision or by order of or referral from a practitioner who is licensed under this act.
>
> . . .
>
> (m) Nurses practicing their profession when licensed and practicing under and in accordance with the provisions of article 11 of chapter 65 of the Kansas Statutes Annotated, and amendments thereto, and any interpretation thereof by the supreme court of this state.

are not engaged in the practice of the healing arts.  K.S.A. § 65-2872.  Chapter 65, article 11 regulates both professional and practical nurses, and advanced registered nurse practitioners.  See K.S.A. §§ 65-1113 through 65-1136.

In addition, the Kansas Supreme Court has commented that a dentist is not a "practitioner of the healing arts."  Tompkins v. Bise, 259 Kan. 39, 45, 910 P.2d 185, 189 (Kan. 1996).  The court also stated, however, that "the primary concern of the legislature in K.S.A. 60-3412 was with prohibiting the use of professional witnesses, not with the licensure of the expert witness."  Id. at 44, 910 P.2d at 190.  The Tompkins court ultimately concluded that a dentist who performs oral surgery could testify regarding the standard of care given by a plastic surgeon performing oral surgery, and stated: "Unless K.S.A. 60-3412 specifically prohibits it, there is no rationale to exclude [the expert]'s testimony in this action merely because he is licensed as a dentist rather than licensed as a

physician." Id. at 47, 910 P.2d at 190. The Tompkins court also stated:

> Does K.S.A. 60-3412 require that the expert witness be licensed by the same board by which the defendant is licensed before the witness can testify in a medical malpractice action? The majority of the Court of Appeals panel in this case stated that K.S.A. 60-3412 requires that "the expert [witness] must be licensed in the same profession [as the defendant]." This statement is incorrect. K.S.A. 60-3412 is silent concerning the licensure of the expert witness. The statute only requires that the expert engage in "actual clinical practice in the same profession in which the defendant is licensed."
>
> Although the language of K.S.A. 60-3412 could be interpreted to mean that the definition of "profession" is related to the licensure of the defendant, the statute does not contain any limitation on licensure. It is important to note that the language requiring that the witness practice the same specialty as the defendant was not included in the final version of the statute. [The defendant] did not have to be licensed as a physician to treat [the plaintiff's] jaw injury. Any physician or dentist trained in oral and maxillofacial surgery was qualified to treat [the plaintiff's] injury. The definition of "profession" must be related to whether the expert is qualified to perform the procedure at issue and is not limited to the particular licensure of the defendant or the expert.
>
> K.S.A. 60-3412 sets forth the minimum requirements of expert witnesses in medical liability cases. The statute requires that an expert witness in a medical malpractice action be engaged in a similar or related area of practice as the defendant health care provider. K.S.A. 60-3412 does not require that a proposed expert in a medical malpractice liability action be licensed by the same professional board in which the defendant health care provider is licensed.
>
> [The expert] satisfied the minimum requirements of K.S.A. 60-3412. [The expert] is a licensed professional who spent more than 50% of his practice treating jaw injuries similar to [the plaintiff's]. The fact that [the expert] is licensed as a dentist, rather than as a

> physician, goes to the weight, not the admissibility, of his testimony.

Id. at 49-50, 910 P.2d at 191-92 (internal citations omitted). In Glassman v. Costello, the Kansas Supreme Court again held that the medical specialties of the expert and the defendant practitioner need not be the same, as long as the expert has "expertise in a similar or related area of practice." 267 Kan. 509, 516-19, 986 P.2d 1050, 1056-58 (Kan. 1999).

Defendants have not moved with respect to Drs. Fine and Luce's expert testimony regarding Nurse Kennett's standard of care or causation. However, in order to preclude such a debate at trial, the court concludes that section 60-3412 is not applicable should either witness be called to state opinions regarding Nurse Kennett. After reviewing the above case law, it is clear that the Kansas courts permit a physician to testify as an expert against a nurse, as long as the physician and the nurse's professional experience is in a similar or related area of practice. The court's oral ruling otherwise at the status conference April 23, 2008 was in error, and is superceded by this written memorandum and order.

This conclusion, however, is strictly limited to its terms. Drs. Fine and Luce are not precluded from testifying as to Nurse Kennett because of their lack of compliance with section 60-3412, or because of their status as physician experts against a nurse. However, in order to testify as an expert as to Nurse Kennett, an expert must still have expertise in a similar area of practice and must still meet the court's other rulings.

## III. CONCLUSION

Defendant's motion (Doc. 131) is GRANTED in part and DENIED in part for the reasons stated more fully herein.

Drs. Fine and Luce will not be permitted to testify as to Dr. Wray's standard of care because neither expert qualifies to give such an opinion under K.S.A. § 60-3412. However, Drs. Fine and Luce are qualified to testify under section 60-3412 as to Nurse Kennett's standard of care.

Drs. Fine and Luce may offer causation opinions as to Dr. Wray or Nurse Kennett, subject to the court's other rulings.

The court reminds the parties of its oral ruling at the April 23, 2008 status conference: each party will be permitted only one expert per "issue." For example, only one expert may testify as to Dr. Wray's standard of care, only one expert may testify as to causation with Dr. Wray, only one expert may testify as to Nurse Kennett's standard of care, only one expert may testify as to causation with Nurse Kennett, etc.

A motion for reconsideration of this order is not encouraged. Any such motion shall not exceed 3 double-spaced pages and shall strictly comply with the standards enunciated by this court in Comeau v. Rupp, 810 F. Supp. 1172, 1174 (1992). The response to any motion for reconsideration shall not exceed 3 double-spaced pages. No reply shall be filed.

IT IS SO ORDERED.

Dated this 24th day of April, 2008, at Wichita, Kansas.

s/Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE